**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michelle Barfield, | No. CV-09-00864-PHX-FJM |
| Plaintiff, | **ORDER** |
| vs. | |
| State of Arizona; Sean Belt; James Hickey; Todd Stoops, | |
| Defendants. | |

The court has before it motions for summary judgment by defendants the state of Arizona, Todd Stoops, James Hickey, and Sean Belt (docs. 104, 107, 105, & 102), plaintiff Michelle Barfield's responses (docs. 120 & 121), and defendants' replies (docs. 127, 129, 125, & 122).

**I. Background**

Plaintiff is a correctional officer employed by the Arizona Department of Corrections. She alleges that she was verbally and physically harassed by other correctional officers, including the individual defendants, because she is a woman and her husband is black. She also alleges that she was subjected to retaliation after she complained to her supervisor. Most of the alleged conduct is undisputed.

In November 2008, plaintiff completed a training course for new officers and was

1  assigned to the maximum-security Cell Block Four of the Central Unit in Florence. She
2  worked on the second shift, which involved rotating among a number of posts on a daily
3  basis. About five officers were posted in the cell block, including one in a control room, one
4  who ran the floor and interacted with the inmates, one who was responsible for the keys, one
5  in the basement, and one in the recreation yard. Officers who primarily worked in the cell
6  block would also rotate to posts at the main gate, a separate health unit, and other cell blocks.
7  Lieutenants made the posting decisions, which sergeants went over with their subordinate
8  officers during briefing sessions before each shift.

9  Sergeant Dolejshi was the direct supervisor for Cell Block Four when plaintiff started
10 working there. Sergeant Wall took over the position a week later. Both were inside the cell
11 block only a short amount of time during the second shift. Plaintiff was allegedly told to
12 listen to the senior officers in the cell block, Hickey and Belt. She was also allegedly told
13 to look to them for guidance on operations and to go to them with any issues or problems.
14 Stoops was a recent hire with a probationary status.

15 When plaintiff met Hickey and Belt, Belt allegedly told her, "Oh, not only do we get
16 a girl, we get, you know, a fucking girl, we get a fish; this is going to be fun." PSOF ¶ 157.[1]
17 "Fish" is a term used for a new officer. Over the next month and a half, Hickey and Belt
18 apparently told plaintiff several times that "girls" should not be working in Cell Block Four.
19 Id. ¶¶ 173, 176. Plaintiff alleges that Hickey would frequently grab her arm and shake it, as
20 well as punch her arms and legs when they passed each other in the cell block. According
21 to plaintiff, Hickey also regularly made comments about her breasts and gestured as if to grab
22 her chest. When she told him that she would slap him if he touched her, Hickey allegedly
23 said that it would be worth a slap. Id. ¶ 165. As they did with other new officers, Hickey

---

[1] The state objects to plaintiff's use of this statement on the grounds of hearsay. Accounts of verbal harassment are rarely offered to prove the truth of the matters asserted. See Rule 801(c), Fed. R. Evid. We reject all of the state's similar hearsay objections. We sustain the state's and Hickey's hearsay objections to plaintiff's use of a letter she wrote to her counsel in February 2009 to prove the truth of the matters asserted. See PSOF, ex. b. We note that plaintiff does not offer an affidavit to replace the letter.

- 2 -

1   and Belt released pepper spray in plaintiff's vicinity four or five times.

2   Stoops made vulgar sexual comments to plaintiff every day that he worked with her.
3   These comments focused on various imagined sex acts involving Stoops, plaintiff, and the
4   inmates. Officer McGee, who is not a defendant, apparently told plaintiff, "Why don't you
5   let me take you back in the ISO Cell and rape you." Id. ¶ 179.

6   On December 1, 2008, Belt grabbed plaintiff, put a handcuff around her wrist, and
7   attempted to attach the other handcuff to the bars of the inner gate in the entrance to Cell
8   Block Four. He was smiling and laughing. Plaintiff was surprised. Although Belt, Hickey,
9   McGee, and several other officers regularly attempted to handcuff each other, she had not
10  seen it happen before. She pulled back Belt's fingers until he let go. She then unlocked the
11  handcuff with her keys. The following day, she showed Belt the abrasion marks on her wrist
12  and told him not to touch her again. Plaintiff recalls his response:

13  > Next time, don't resist and you won't get [hurt] . . . Oh, Barfield if you can't
    > take it, if you're not tough enough, you know, get out if you, you know, that's
14  > how, you know, it is in CB-4. That's how we initiate. That's how, you know,
    > if you're a girl and you can't– they constantly said, you know, that's why girls
15  > shouldn't be working here. That's why girls shouldn't be in here because you
    > can't take it.
16
17  Id. ¶ 176. According to plaintiff, Belt handcuffed her to the inner entrance gate about a week
    later. He allegedly took her keys and tossed them to Stoops. Plaintiff recalls telling him:
18
    > You bruised up my wrists already, I– you know what, if that makes you– you
19  > know, I was just like I'm–I didn't fight him. I didn't resist, . . . I was just like,
    > if that makes you happy, do it, do it, if that–you know, if you feel like a man,
20  > if that–that's what you– and so he did it and laughed and walked away.

21  Barfield Deposition at 130. Stoops apparently threw the keys back to her, and she unlocked
22  the handcuffs.

23  Around December 8, 2008, Hickey came up to plaintiff while she was in the control
24  room, restrained her arms behind her back, and tried to pull her down. Hickey alleges that
25  plaintiff challenged him to a wrestling match, which she disputes. Hickey, Belt, McGee, and
26  several other officers regularly wrestled each other in Cell Block Four. During the
27  altercation, plaintiff alleges that Hickey tried to grab her breast. He also allegedly said that
28  her crotch smelled like lavender and he would perform oral sex on her. Several days later,

- 3 -

plaintiff went to an urgent care center with complaints of severe pain in her back and left shoulder. She had surgeries on her shoulder in June and October 2009.

Plaintiff says that she first complained to Wall, her supervisor, in early December 2008. She allegedly informed him that officers were engaging in unprofessional conduct in Cell Block Four, including "the horseplaying, the hazing, goofing off." PSOF ¶ 104. She also allegedly reported to Wall that she was being subjected to vulgar, constant harassment, including remarks about her breasts. PSOF ¶ 182; Arizona's Statement of Facts ("ASOF") ¶ 105. She maintains that she had a similar conversation with Wall a few weeks later. She says that he seemed overwhelmed and, during one of their conversations, said the following:

> Stop telling me, I don't want to hear it. I don't want to hear it. I don't want to hear it, because it – because then I have to be forced to write it up. I don't want to hear it. Stop talking. Just let me try to take care of it.

PSOF ¶ 185. Wall does not recall these alleged conversations and denies that he was told about horseplay, handcuffing, or the use of pepper spray. ASOF, ex. K at 118-20.

On December 25, 2008, Stoops saw a picture of plaintiff's teenage daughter on her cell phone at the end of their shift. Plaintiff is white. Her husband is black. She says that Stoops asked her if her daughter was black and made a series of offensive sexual and racial comments involving Stoops, plaintiff, her daughter, and her husband. Plaintiff allegedly told Stoops to never talk to her again and to not tell anyone about her husband's race.

On December 27, 2008, plaintiff came across Stoops, Hickey, Belt, and McGee in the basement of Cell Block Four. Hickey allegedly told her, "Oh, so Barfield, your husband is black," "I can't believe you fuck a black person," and "I used to beat up little black kids on the way to school." Id. ¶ 19. Stoops recalls that he and Belt told plaintiff that she could not leave the locked basement unless she opened her shirt. When she refused, Stoops says that he took the keys from Belt and let her out.[2] Later, Hickey apparently told plaintiff that he was a hood-wearing member of the Ku Klux Klan. Plaintiff says that no one harassed her

---

[2] The state objects to Stoops's account because plaintiff did not mention a locked door during her deposition. But it fails to show a contradiction between plaintiff's account and Stoops's.

- 4 -

1  on the basis of sex or race after these incidents.

2        There is no dispute that plaintiff complained to Wall on December 28, 2008. He and
3  Dolejshi interviewed plaintiff after she said that she was going to quit. They had her type a
4  report in their office. She says that she was including everything that had happened to her,
5  but they told her to focus on Stoops because he was not a permanent employee. She also
6  alleges that Wall deleted a portion of her report. The state alleges that plaintiff only
7  complained about Stoops. Plaintiff did not see Stoops again. He was investigated and
8  terminated a week later.

9        From the time of her formal complaint until February 3, 2009, plaintiff says that she
10 was posted outside of Cell Block Four more than she was before. She also says that Hickey
11 and Belt refused to talk to her and did not help her with shared duties inside Cell Block Four,
12 such as counting the inmates and picking up inmate mail. The state alleges that plaintiff's
13 posting rotation was normal, she did not work with Hickey during this time period, and she
14 worked with Belt only part of the time.

15       After plaintiff objected to being posted outside Cell Block Four on February 2, 2009,
16 she met with Lieutenant Munguia, who encouraged her to come forward with what was
17 bothering her. The following day, plaintiff met with Captain Hart and the Deputy Warden.
18 She wrote a statement detailing Hickey's and Belt's alleged harassment. Plaintiff did not
19 work with Hickey and Belt again. They were moved to another unit two days later.

20       After an investigation, which lasted several months, Hickey was given an eighty-hour
21 suspension without pay for inappropriately deploying pepper spray, "wrestling with a female
22 coworker," and telling plaintiff that he used to beat up black kids on his way to school. Id.,
23 ex. N at 1. Belt received an eighty-hour suspension without pay for handcuffing plaintiff and
24 inappropriately deploying pepper spray. McGee was suspended for forty hours without pay
25 for, among other things, "engaging in horseplay with coworkers." Id., ex. P at 1. Wall was
26 issued an official reprimand which states, "[I]t was discovered that you failed to supervise
27 your subordinates assigned to CB 4. If you had been more involved with your subordinates,
28 the inappropriate behavior would have been dealt with sooner or not happened at all." PSOF

1 ¶ 253.

2 On February 6, 2009, plaintiff filed a complaint with the Equal Employment
3 Opportunity Commission ("EEOC") alleging sex- and race-based harassment by Hickey,
4 Belt, Stoops, and McGee, as well as posting-related retaliation in violation of Title VII of the
5 Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3. Around the same time, plaintiff
6 says that an inmate with a suspected white supremacist gang affiliation told her, "Barfield,
7 I hear you like dark skin." PSOF ¶ 244. She believes that Belt or Hickey told an inmate that
8 her husband was black. Due to safety concerns, plaintiff requested a transfer to another
9 correctional facility. The request was granted. In April 2009, plaintiff was issued a right to
10 sue letter in lieu of a timely investigation or civil action.

11 Plaintiff alleges that the state subjected her to a hostile work environment and
12 retaliated against her in violation of Title VII. She alleges that Stoops, Hickey, and Belt
13 discriminated against her on the basis of sex or race, presumably under the Equal Protection
14 Clause of the Fourteenth Amendment, and thus deprived her of civil rights in violation of the
15 Civil Rights Act of 1871, 42 U.S.C. § 1983. Plaintiff also generally alleges that defendants
16 engaged in a pattern of retaliation against her. Defendants move for summary judgment on
17 all claims.

## II. Title VII – Hostile Work Environment

19 Under Title VII, employers are liable for negligently creating a hostile work
20 environment due to discriminatory harassment by coworkers. See McGinest v. GTE Serv.
21 Corp., 360 F.3d 1103, 1119-20 (9th Cir. 2004). To prevail, plaintiff must show that she was
22 subjected to unwelcome verbal or physical conduct based on sex or race, the abusive conduct
23 was severe or pervasive enough to alter the conditions of her employment, and the state knew
24 or should have known of the conduct but failed to take adequate remedial measures. See id.
25 at 1112-13. The inquiry is both subjective and objective, with the latter component based
26 on someone with plaintiff's characteristics. Id. at 1113-15. We consider all of the
27 circumstances to determine whether an environment is hostile. Harris v. Forklift Sys., Inc.,
28 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993).

First, the state challenges plaintiff's ability to support a hostile work environment claim based solely on racial harassment. It contends that the alleged racial comments concerning plaintiff's husband and daughter are non-actionable because "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient to alter employment conditions. Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998) (quotation and citation omitted). The state does not dispute plaintiff's ability to show sufficiently severe or pervasive sex-based harassment to support a hostile work environment claim.

Plaintiff asserts that the state's challenge is inapposite because her claim is based on both sex- and race-based harassment. A plaintiff may aggregate evidence of discriminatory harassment to show a hostile work environment. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 572 (2d Cir. 2000) (permitting aggregation where evidence was otherwise sufficient to support independent claims); Hafford v. Seidner, 183 F.3d 506, 514-15 (6th Cir. 1999) (permitting aggregation where evidence of racial harassment was otherwise sufficient); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1416 (10th Cir. 1987) (permitting aggregation). The state argues that the Hicks line of cases is inapplicable because it involves subclasses of protected statuses that are readily apparent to others, such as black women, whereas plaintiff's coworkers did not know about her interracial marriage until late December. Based on this distinction, the state asserts that aggregation of discriminatory harassment is justified only insofar as it identifies harassment targeted at a particular subclass. Were this the sole justification, however, it would necessarily mean that discriminatory harassment clearly targeted at a subclass, such as black women, could not be aggregated with discriminatory harassment clearly targeted solely at one of the protected statuses involved. We reject such a balkanized approach. Because the state does not otherwise provide a persuasive reason why the alleged racial comments directed toward plaintiff did not contribute to an abusive working environment, we deny its motion for summary judgment with respect to racial harassment.

Second, the state isolates plaintiff's evidence of physical harassment by Hickey and

1  Belt and contends that their conduct was not discriminatory. It points out that the record
2  contains ample evidence that some of the officers in Cell Block Four, including Hickey and
3  Belt, engaged in wrestling, handcuffing, and pepper spray incidents involving both men and
4  women. ASOF ¶¶ 61-72. Hickey and Belt apparently punched each other, and at least one
5  new officer handcuffed Belt. Id. ¶¶ 72, 61. Because the state does not dispute plaintiff's
6  ability to show sufficient discriminatory harassment, however, parsing out allegedly non-
7  discriminatory incidents serves little purpose on a motion for summary judgment. In any
8  event, plaintiff alleges that Hickey attempted to grab her breast and made a comment about
9  oral sex while wrestling her to the floor. PSOF ¶ 170. She also alleges that Belt told her that
10 women should not work in Cell Block Four and she should "get out" if she could not take
11 being handcuffed. Id. ¶ 176. For purposes of summary judgment, we may reasonably infer
12 that Hickey and Belt physically harassed plaintiff because of her sex. Therefore, we deny
13 the state's motion with respect to physical conduct.

14 Third, the state challenges plaintiff's ability to show that it acted negligently. In the
15 context of coworker harassment, an employer is only liable where it knows of, or in the
16 exercise of reasonable care should know of, the existence of a hostile work environment and
17 fails to take "remedial measures reasonably calculated to end the harassment." McGinest,
18 360 F.3d at 1120. The state acknowledges plaintiff's testimony that she complained about
19 unprofessional behavior and comments about her breasts to her supervisor, Wall, in early
20 December 2008. It also acknowledges plaintiff's testimony that Wall steered her toward
21 complaining solely about Stoops and deleted a portion of her report on December 28, 2008.
22 It asserts, however, that plaintiff's testimony contradicts her prior statements in a letter to her
23 counsel, which she gave to the state during its investigation.

24 The letter includes a time line of events from September 2008 through mid-February
25 2009, but it does not mention a conversation with Wall before December 28, 2008. With
26 respect to that day, plaintiff wrote, in part, "I knew none of the Sgt. was good friends with
27 Officer Stoops and he had been there less than a year so and maybe if I reported him they
28 would all stop." ASOF, ex. D at 3. She did not mention a written report, although its

existence is undisputed. With respect to January 27, 2009, plaintiff described a conversation with Wall as follows:

> Then I said, between you and me, you know Officer Stoops wasn't the only one who was saying and doing stuff.[] Sgt. Wall replied, 'I know and I appreciate what you did.' Leave it at that. You had your chance to say something. Let it go. I said, 'I knew this would happen.'

Id., ex. D at 4-5. Aside from plaintiff's allegations concerning Wall, the state maintains that plaintiff cannot show that it was negligent.

Parties may not create issues of fact on summary judgment by clearly contradicting prior sworn statements. See Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998-99 (9th Cir. 2009). We agree with the state that the letter fits uneasily with plaintiff's testimony. But they are not clearly inconsistent, and the letter is not a sworn statement. Although plaintiff waived attorney/client privilege with respect to the letter, we note that it is unusual to draw conclusions from a free-form letter written to a party's counsel under a "confidential" heading. Moreover, the state had access to this letter before plaintiff's deposition, giving it an opportunity to address its concerns. We conclude that plaintiff presents a material issue of fact concerning the adequacy of Wall's response to her alleged complaints. Thus, we need not consider plaintiff's evidence that the state otherwise knew of, or should have known of, a hostile work environment.[3] We deny the state's motion for summary judgment on plaintiff's Title VII hostile work environment claim.

### III. Title VII – Retaliation

Title VII prohibits employers from discriminating against employees because they have opposed an unlawful employment practice under Title VII. 42 U.S.C. § 2000e-3(a). To prevail on a retaliation claim, plaintiff must show that she engaged in protected activity, the state subjected her to a material adverse action, and a causal link exists between the

---

[3] We note that the state may also be found negligent with respect to its disciplinary measures. The state may pay dearly at trial for its failure to discharge these employees for their utterly unacceptable conduct. While it may be difficult to recruit and train correctional officers, a standard must be set.

activity and the action. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006); Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000). An action is materially adverse if it would likely dissuade a reasonable employee from making or supporting a charge of discrimination. White, 548 U.S. at 68, 126 S. Ct. at 2415.

Plaintiff presents a moving target with respect to her Title VII retaliation claim. The only retaliation-related allegation in her EEOC charge states, "Subsequent to my complaint, I was assigned to a post outside of my normal team assignment." ASOF ¶ 129. Plaintiff's Amended Complaint merely states, "Defendants commenced a pattern of retaliation against Plaintiff." Amended Complaint ¶ 21. The state contends that its daily roster sheets for the time period in question do not reveal any abnormalities. ASOF ¶¶ 39-52. Plaintiff does not address the state's contention, thereby abandoning her posting-related retaliation claim. Indeed, she admits that Munguia was responsible for the posting decisions, and she does not believe that Munguia was retaliating against her. PSOF ¶¶ 47, 136.

Instead, plaintiff advances a retaliation claim based on ostracism, a lack of teamwork by Hickey and Belt, and a belief that one of them told an inmate that her husband was black. As the state highlights, these allegations do not appear in plaintiff's EEOC charge or in her conclusory Amended Complaint. Although plaintiff admits the state's statements of fact concerning her pleading deficiencies, PSOF ¶¶ 129-30, she does not address the deficiencies in her response. Because she did not fairly raise one in her Amended Complaint, plaintiff may not proceed with a retaliation claim unrelated to her postings. Accordingly, we grant the state's motion for summary judgment on plaintiff's retaliation claim.[4]

---

[4] We note that the state does not raise the administrative exhaustion requirement under Title VII. See Freeman v. Oakland Unified Sch. Dist., 291 F.3d 632, 636 (9th Cir. 2002) (holding that a federal court lacks subject matter jurisdiction over allegations unlike or not reasonably related to the allegations included in an EEOC charge). Based on the United States Supreme Court's recent clarification of jurisdictional requirements, we decline to raise the issue sua sponte because Congress did not clearly state that the Title VII exhaustion requirement is jurisdictional rather than a "claim-processing rule." See Reed Elsevier, Inc. v. Muchnick, __ U.S. __, __, 130 S. Ct. 1237, 1244-45 (2010) (relying on Arbaugh v. Y & H Corp., 546 U.S. 500, 126 S. Ct. 1235 (2006)); cf. Spengler v. Worthington Cylinders, No.

**IV. Title VII – Punitive Damages**

Plaintiff requests punitive damages against all defendants. The state explains that a Title VII plaintiff may only recover punitive damages against an employer "other than a government, government agency or political subdivision." 42 U.S.C. § 1981a(b)(1). Plaintiff, who does not address the issue, may not seek punitive damages from the state.

**V. 42 U.S.C. § 1983 – Individual Defendants**

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides a remedy for individuals deprived of federal civil rights by state actors. To prevail, plaintiff must show the deprivation of a right protected by the Constitution or laws of the United States committed by a person acting under color of state law. Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006). Although she does not explicitly identify a substantive right in her Amended Complaint, plaintiff apparently claims that Stoops, Hickey, and Belt deprived her of equal protection under the Fourteenth Amendment through discriminatory workplace harassment. See Alaska v. EEOC, 564 F.3d 1062, 1068 (9th Cir. 2009) (holding that sexual harassment in public employment can violate the Equal Protection Clause); Bator v. State of Hawaii, 39 F.3d 1021, 1027-29 (9th Cir. 1994) (same). Stoops, Hickey, and Belt contend that they cannot be held liable under § 1983 because they were not acting under color of state law.

There is no rigid formula for determining whether a state officer's actions are under color of state law or private. Anderson, 451 F.3d at 1068. The inquiry "turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." Id. (quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)). In Anderson, the court considered (1) whether the officer's conduct was performed while he was acting, purporting, or pretending to act in the performance of his official duties, (2) whether his conduct had the purpose and effect of influencing the behavior of others, and (3) whether the conduct was related in some meaningful way to either the

---

08-3110, 2010 WL 2900317, *4 (6th Cir. July 27, 2010) (concluding that the administrative exhaustion requirement under the Age Discrimination in Employment Act, 29 U.S.C. § 626(d), was not jurisdictional in light of Arbaugh).

- 11 -

officer's governmental status or to the performance of his duties. Id. at 1069. Our inquiry goes beyond whether the individual defendants were acting within the scope of their authority because § 1983 reaches the "the misuse of power, possessed by virtue of state law and possible because the wrongdoer is clothed with the authority of state law." United States v. Classic, 313 U.S. 299, 326, 61 S. Ct. 1031, 1043 (1941). In the context of this case, we will draw from two perspectives: cases dealing with the abuse of state positions and cases dealing with the abuse of workplace relationships in public employment.

### A. Abuse of State Positions

With respect to the individual defendants' state positions as correctional officers, plaintiff notes that the alleged conduct occurred at a state prison complex during work hours while Stoops, Hickey, and Belt were in uniform. She also highlights Hickey's and Belt's use of state-issued pepper spray and Belt's use of state-issued handcuffs. Moreover, she contends that Belt misused his authority to hold Cell Block Four keys when he allegedly refused to open the basement door on December 27, 2008.

Indicia of state authority, such as uniforms and state-issued law enforcement equipment, are significant because they can influence the behavior of others by projecting a badge of authority. But they are not dispositive. In Van Ort v. Estate of Stanewich, 92 F.3d 831 (9th Cir. 1996), the court considered whether a sheriff's deputy was acting under color of state law when he conducted a narcotics search of a home and returned while off duty to rob the homeowner. Although he carried handcuffs and a gun, and was recognized as a police officer, he was not a state actor because he used his gun and physical force, but not his authority, to gain entry after the homeowner opened the door without knowing who was there. Id. at 839-40. Likewise, on-duty police officers who used a trench coat, mask, M-16 rifle, communications equipment, and police cars, all owned by the defendant town, to stage the robbery of a convenience store as a practical joke were not acting under color of state law because they did not use their authority as police officers. Haines v. Fisher, 82 F.3d 1503, 1505-08 (10th Cir. 1996). In the case most similar to the one before us, a police officer was not acting under color of state law where he accidentally maimed a fellow officer at a

- 12 -

1  police station while taunting him by repeatedly pointing a gun at his crotch and asking him
2  if he was afraid. Martinez, 54 F.3d at 982-83. The court concluded that the shooter "was
3  bent on a singularly personal frolic: tormenting an acquaintance. Though on duty and in
4  uniform, [his] status as a police officer simply did not enter into his benighted harassment
5  of his fellow officer. Hazing of this sort, though reprehensible, is not action under color or
6  pretense of law." Id. at 987. Because the plaintiff had abandoned the argument, the court
7  did not decide whether the shooting was under color of state law due to the use of a service
8  revolver. Id. In dicta, however, it distinguished the importance of indicia of authority where
9  citizens are involved from situations involving fellow officers:

> [W]hen the victim is himself a fellow officer and the particular interaction between the two officers is of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state, and, in turn, to forgo exercising his legal rights.

13 Id. at 988 n.6. In sum, these cases suggest that the location, timing, and equipment involved
14 in any given situation must be viewed in context with their connection to the use or pretense
15 of authority and their effect on others. State employees do not act under color of state law
16 merely because they are in uniform, on duty, and using state equipment.

17  Turning to the Anderson factors, plaintiff does not argue that the individual
18 defendants used their uniforms and state-issued equipment as a badge of authority with the
19 purpose and effect of influencing the behavior of others. She concedes that she knew that
20 their alleged conduct was inappropriate, against the rules, and not a part of their official
21 duties. See Barfield Deposition at 507-09. Moreover, she does not contend that they were
22 otherwise acting under the pretense of state authority, at least with respect to their positions
23 as correctional officers. The closest plaintiff comes to establishing a relationship between
24 the alleged conduct and the performance of official duties concerns Belt's use of handcuffs
25 and his alleged refusal to unlock a basement door. The state provides correctional officers
26 with the ability to detain people within prisons. The abuse of this coercive authority is
27 indefensible. Belt's admitted handcuffing of a fellow officer placed everyone in the prison
28 in danger, and such conduct should not be permitted under any circumstances. The evidence

1 plaintiff presents, however, makes it clear that the purpose and effect was not to detain
2 another officer for any length of time. Thus, we cannot say that Belt's conduct was
3 meaningfully related to his official duties. Based on the abuse of state positions alone, there
4 is insufficient evidence to show that the individual defendants were acting under color of
5 state law.

## B. Abuse of Workplace Relationships in Public Employment

7 Plaintiff also contends that Stoops, Hickey and Belt were acting under color of state
8 law because their alleged conduct constituted an abuse of their de facto supervisory authority.
9 She alleges that she was initially confused who her supervisor was because Wall replaced
10 Dolejshi a week after plaintiff began working in Cell Block Four and they both spent little
11 time in the cell block during the second shift. According to plaintiff, she was told to listen
12 to Hickey and Belt as her senior officers and to look to them for guidance on how to run the
13 cell block. She was also allegedly told to seek them out if she had any issues or problems.
14 She concedes, however, that Stoops was not a senior officer. PSOF ¶ 156. Under these
15 circumstances, plaintiff asserts that Dolejshi and Wall delegated their supervisory authority
16 to the senior correctional officers in Cell Block Four.

17 In the absence of supervisory authority, public employees who harass coworkers do
18 not generally do so under the color of state law because they are not using or purporting to
19 use state authority. In Hughes v. Halifax County School Board, 855 F.2d 183 (4th Cir.
20 1988), two maintenance department workers taunted a black coworker at a job site and staged
21 his mock hanging using a piece of rope. The court concluded that they were not acting under
22 color of state law because they did not exhibit the indicia of state authority. Id. at 186-87.
23 In Ottman v. City of Independence, 341 F.3d 751, 762 (8th Cir. 2003), the court concluded
24 that a city planner who allegedly made repeated sexist remarks to another city planner at
25 work was not acting under color of state law because he "was a co-worker with no
26 supervisory control or authority over" the plaintiff. Similarly, in Edwards v. Wallace
27 Community College, 49 F.3d 1517, 1523 (11th Cir. 1995), the court concluded that
28 coworkers who allegedly harassed a word processing specialist on the basis of race were not

- 14 -

1 liable under § 1983 because they were "coemployees of [the plaintiff] without any
2 supervisory authority over [her]." In David v. City and County of Denver, 101 F.3d 1344,
3 1354 (10th Cir. 1996), the court concluded that a police officer could state a § 1983
4 harassment claim against her fellow officers because, while coworkers do not generally act
5 under color of state law, "in certain instances co-employees may exercise de facto authority
6 over sexual harassment victims such that they act under color of law." We note that, in Bator
7 v. State of Hawaii, 39 F.3d 1021, 1027-29 (9th Cir. 1994), the Ninth Circuit denied qualified
8 immunity to a supervisor and a coworker who allegedly harassed a probation officer on the
9 basis of sex and race. However, the court did not explicitly address whether the coworker
10 was acting under the color of state law. Based on the above cases, we start from the premise
11 that public employees do not typically act under the color of state law when they harass
12 coworkers.

13 We now turn to plaintiff's contention that Hickey and Belt, as senior correctional
14 officers, were her de facto supervisors. In Bonenberger v. Plymouth Township, 132 F.3d 20
15 (3d Cir. 1997), the court addressed this issue in the context of a police dispatcher who
16 claimed that a sergeant subjected her to regular obscene remarks and unwelcome sexual
17 advances. The sergeant was not her official supervisor, but he supervised the dispatchers
18 when no higher-ranking officer was on duty. Id. at 22. The trial court had granted summary
19 judgment to the sergeant on the grounds that he was not acting under color of state law
20 because he "had no authority to hire, fire, or make any employment decision regarding" the
21 plaintiff. Id. at 23. The court held that these criteria were not dispositive and reversed. It
22 focused on the sergeant's ability to control the plaintiff's workload, including when the
23 dispatchers would take breaks and which tasks they would perform, in addition to his ability
24 to give her orders and begin a disciplinary process for insubordination. Id. at 24. The court
25 distinguished a district court case which involved a § 1983 sexual harassment claim where
26 the plaintiffs alleged that a fellow police officer, who held the same official rank, acted under
27 color of state law due to his seniority and strong connections within the department. Id.; see
28 Rouse v. City of Milwaukee, 921 F. Supp. 583 (E.D. Wis. 1996). The Bonenberger court

1 concluded that the claims were dissimilar because the senior police officer in Rouse "did not
2 supervise the plaintiffs' work, and his seniority afforded him no authority over his
3 colleagues' assignments." 132 F.3d at 24.

4 Here, plaintiff presents insufficient admissible evidence to show that Hickey or Belt
5 had or purported to have supervisory authority over her. She concedes that lieutenants
6 controlled where she was posted, which determined her duties on any particular shift. She
7 does not contend that Hickey or Belt could change her posting. To be sure, she alleges that
8 Belt affected her workload in January 2009 by refusing to help with duties shared by the Cell
9 Block Four team, such as picking up inmate mail. But this does not approach the type of
10 control addressed in Bonenberger. Moreover, there is no indication that Hickey or Belt could
11 give orders to plaintiff backed by the threat of discipline. Although plaintiff was allegedly
12 told to listen to her senior officers when she started working in Cell Block Four, plaintiff
13 does not contend that Hickey or Belt assumed and then abused the role of a mentor.

14 Plaintiff also argues that Dolejshi's and Wall's absence from Cell Block Four and
15 their refusal to address complaints gave "their de facto seal of approval" to the individual
16 defendants' misconduct. Response at 4. Plaintiff does not allege that Dolejshi, Wall, or the
17 state is liable under § 1983. Thus, the issue is whether the state delegated supervisory
18 authority to Hickey or Belt by allegedly failing to supervise them, not whether there is an
19 independent basis for liability. In Bonenberger, the court noted that government employers
20 should not be permitted to evade statutory protections by avoiding labeling workers as
21 supervisors. 132 F.3d at 25. That is not the case here. The prison complex's regimented
22 chain of command, with defined duties for each post, does not suggest that other correctional
23 officers assumed a supervisory role when sergeants were not present during a particular shift.

24 Considering the individual defendants' alleged abuse of state positions together with
25 their alleged abuse of workplace relationships, we conclude that they were not acting under
26 color of state law. Thus, we do not reach their remaining contentions because they cannot
27 be held liable under § 1983. Our conclusion reflects the purpose of § 1983, which is "to
28 deter state actors from using the badge of their authority to deprive individuals of their

- 16 -

1  federally guaranteed rights." <u>Anderson</u>, 451 F.3d at 1067. State tort law is designed to deter
2  private actors from harming others. We note that plaintiff does not allege state tort claims
3  against Belt, Hickey, and Stoop for their revolting conduct.
4  We acknowledge that the result here is, at first blush, counterintuitive–the more
5  culpable defendants are out–the state is in. Yet this follows from the scope of federal law
6  which addresses employers more pervasively than co-employees. State law protects
7  employees from the bestial behavior of co-employees.

8  **IT IS THEREFORE ORDERED GRANTING IN PART** and   **DENYING IN**
9  **PART** the state's motion for summary judgment (doc. 104). Summary judgment is granted
10 on plaintiff's Title VII retaliation claim and her request for punitive damages. It is denied
11 on plaintiff's Title VII hostile work environment claim.

12 **IT IS FURTHER ORDERED GRANTING** Todd Stoops's, James Hickey's, and
13 Sean Belt's motions for summary judgment (docs. 107, 105, & 102).

14 DATED this 15th day of September, 2010.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge